[No. 30648. *En Banc.* March 4, 1949.]

ETTA J. PARRISH, *Individually and as Administratrix, Respondent,* v. A. A. ASH *et al., Appellants.*[1]

[1]Reported in 203 P. (2d) 330.

638

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for appellants.

*Futter, Merrick & Merrick,* for respondent.

STEINERT, J.—This action was brought by the plaintiff individually and as administratrix of her deceased husband's estate, to recover damages for personal injuries to herself and for the death of her husband. The accident out of which the action arose occurred at a time when both the plaintiff and her husband were riding in the defendants' automobile, on an occasion when the automobile, driven by one of the defendants, collided with a truck operated by a third person not a party to this litigation.

The complaint alleged that, during the trip which culminated in the collision, plaintiff and her husband were riding as paying passengers in the defendants' private automobile, and that the collision, injuries, death, and loss were proximately caused by the negligence of the defendant automobile driver. The defendants denied these allegations and, by way of affirmative defense, alleged that, at the time of the accident, plaintiff and her husband were riding as invited guests or licensees in defendants' car, and that the accident was not the result of any negligence or of any intentional act on the part of the defendants. They further alleged, as an additional affirmative defense, that the accident was caused by the negligence of the truck driver. The allegations of both affirmative defenses were denied by the plaintiff in her reply.

The action was tried before a jury, which returned a verdict for the plaintiff on both causes of action, in the total sum of $8,703.53. The usual post-trial motions were thereafter interposed and were denied by the court, whereupon judgment was entered on the verdict. Defendants appealed.

No contention is made on this appeal that the appellant driver was not negligent, or that her negligence was not the proximate cause of the damages sustained by the respondent. The sole question here involved, and the one upon which the validity of the judgment herein depends, is whether the status of the respondent and her husband, while they were riding in appellants' car, was that of paying passengers or was merely that of invited guests or licensees, within the purview of Rem. Rev. Stat., Vol. 7A, § 6360-121 [P.P.C. § 295-95], which provides:

"No person transported by the owner or operator of a motor vehicle as an invited guest or licensee, without payment for such transportation, shall have cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator. . . ."

■ Whether one who is being transported in a motor vehicle is a passenger for hire or is a guest or licensee, within the contemplation of a statute relating to the liability of the owner or operator of such vehicle for injury to an accompanying guest or licensee, depends largely upon the facts and circumstances of the particular case. *George v. Stanfield*, 33 F. Supp. (D. C. Idaho) 486; 4 Blashfield (Part 1), Cyclopedia of Automobile Law and Practice (Perm. ed.), 306, § 2292; 5 Am. Jur. 634, Automobiles, § 239; 42 C. J. 1055, Motor Vehicles, § 803.

The unusual and peculiar factual situation presented in this particular suit and the issues raised therein make the case one to which the principle just stated is singularly applicable. For this reason, and because of the conflicting contentions relating to the crucial point here under consideration, we shall refer to the evidence in some detail and, to the extent deemed necessary, shall quote directly from the testimony as given by the witnesses.

For some time prior to the accident here involved, respondent, Etta J. Parrish, and her husband, Thomas J. Parrish, now deceased, owned, lived upon, and operated a nine-acre farm near the town of Finley, about seven miles

east of the city of Kennewick. In addition to their farm operation, they also from time to time took employment elsewhere. In the city of Kennewick was a grape juice plant, and, at the beginning of the grape harvest season of 1947, commencing in the early part of September, Mr. and Mrs. Parrish obtained employment at this plant. As a means of transportation to and from work, they contemplated using an automobile which they themselves owned.

Appellants, A. A. Ash and his wife, Hazel Ash, resided upon a ten-acre farm a half-mile east of Finley and approximately the same distance east of respondent's home. Mrs. Ash had likewise secured employment at the Kennewick grape juice plant and, as a means of transportation to and from work, contemplated using the automobile owned by herself and her husband, which is the automobile involved in this action.

Mrs. May McCalmant, whose home was situated between that of the respondent and that of the appellants, had also sought and obtained employment at the grape juice plant. It does not appear that she owned an automobile or had any regular means of transportation to and from her work.

The accident out of which this action arose occurred on September 9, 1947. However, in determining whether respondent and her husband were at that time paying passengers or were merely guests of the appellants, the events of the preceding day, September 8th, must be considered.

It appears that the parties in charge of the grape juice plant in Kennewick had intended to begin grape-pressing operations on the morning of September 8th. Accordingly, on that morning, Mr. and Mrs. Parrish drove to the plant in their automobile, expecting to commence their seasonal employment there at that time. With that same purpose in mind, appellant Hazel Ash drove appellants' automobile to the plant. Mrs. McCalmant likewise reported for work, having come with Mr. Donald Hummel, a neighbor who was also to be employed at the same premises.

Upon their arrival at the grape juice plant, the men were put to work at once, but as the plant was not quite ready to begin the particular operation upon which the women were to be engaged, the latter were told at about noon of that day that there would be no work for them until the next day.

Mrs. Parrish then desired to go home, rather than wait until her husband had finished his work in the late afternoon. Seeking a means of transportation to her home, she asked Mrs. Ash for a ride, to which request Mrs. Ash gave a favorable response. Mrs. McCalmant, who also wished to return home, made a similar request, which Mrs. Ash likewise granted. The homes of the three women were on or near the same public road and not more than a half-mile distant from each other.

On the homeward trip in Mrs. Ash's five-passenger automobile, the three women above named occupied the front seat. Upon the back seat and in the rear portion of the car was a large quantity of stale bread, which Mrs. Ash had purchased in Kennewick for use as chicken feed; the bread was a day old, but otherwise was in good condition. According to the testimony of Mrs. Ash, there was also then present in the car Mrs. Edna Brand, who rode in the back seat, on her way home from the plant; according to the testimony of Mrs. Parrish and Mrs. McCalmant, however, Mrs. Brand was not present on that occasion.

The principal question of fact here in dispute is whether payment for her individual transportation as above described was made by Mrs. Parrish and was accepted as such by Mrs. Ash. Upon the determination of that question depends the nature of the relationship existing between the respondent and the appellants on September 8th and, by inference, the relationship existing between the Parrishes and the appellants on the following day when the accident occurred.

The evidence submitted by the respondent was to the effect that when the Ash car, carrying the three women as testified by respondent, arrived at a row of mail boxes situated about a quarter of a mile from respondent's home,

she alighted from the automobile and immediately thereafter paid Mrs. Ash the sum of ten cents for the ride; and that she then asked for and purchased from Mrs. Ash one of the loaves of bread for home use, paying an additional five cents therefor. Mrs. Ash's testimony was to the contrary. Her version was that nothing whatever was said about payment for the ride, but that Mrs. Parrish paid her ten cents for two loaves of bread. This dispute in the evidence constituted the principal and vital issue in the case and, in our opinion, presented an exceedingly close question for determination. For these reasons, we deem it advisable to quote directly from the testimony of the principal witnesses.

On direct examination, Mrs. Parrish first related the events which took place on the day of the accident, September 9th. She was then interrogated, and testified, regarding the events of the preceding day, as follows:

"Q. Had you ridden with Mrs. Ash the day before? A. Yes, sir. Q. Had you paid her for riding? A. Yes, sir. Q. How much? A. A dime. Q. Was anyone with you. A. Yes, sir. Q. Who was it? A. Mrs. McCal*met*. Q. She was working at Church's [grape juice plant] too? A. Yes, sir. Q. She was present when you paid your fare? A. Yes, sir. Q. Did you intend to pay for the ride on the day of the accident? [Objection interposed, followed by argument of counsel and ruling by the court]. Q. Did you intend to pay for the ride on the day you were hurt? A. I sure did. Q. And you were ready to pay for it? A. Yes, sir. Q. Is there a custom in that community for the payment for the rides with people? A. There is. [Objection sustained and answer stricken.]"

On cross-examination, Mrs. Parrish testified:

"Q. When you asked, or when this arrangement whichever it was, you asked her or she asked you if you could ride home that day, nothing was said about any payment, was there? A. Not at that time. Not until I got out of the car. Q. In fact, nothing was said about the fact you were going to ride home other than just you wanted to ride rather than wait and go home with your husband? A. Yes. Q. How far is it from Church's to your home? A. Seven miles. Q. How far do the Ash's live from your place? A. Not very far. About a quarter of a mile I don't [*sic*] guess. Q. Did Mrs. Ash

drive directly home after you got in the car? A. She did as far as I went. I got out at the mail box and paid her for the ride and walked on home. . . . Q. In any event, at the time you got out of the car, or before, you said you desired, you wanted two loaves of bread, is that right? A. No, one loaf. . . . Q. What happened when you desired—when you wanted a loaf of bread. Did you ask? A. I said I intended to get a loaf of bread and said I needed a loaf, and she said I might have a loaf of this. . . . Q. Is it not a fact, Mrs. Parrish, you paid Mrs. Ash this dime for the bread? A. Oh, no. I gave her a nickel for the bread. Q. An· a nickel for the ride? A. No, I paid her a dime for the ride, and gave her a nickel for the bread. Q. You gave her both a dime and a nickel? A. Yes. Q. Are you sure? A. Absolutely, I am. . . . Q. When did you give her the nickel that you say you gave her for the bread? A. After I got out of the car. Q. Was it at the same time you gave her the dime? A. Yes, no not at the same time. Not at the same time. I didn't hand her both pieces at the same time. Q. When did you give her this nickel for the bread? A. I had paid her for the ride and then was talking about the bread and she asked if I wanted a loaf of bread, or would I like to have the bread and I asked her how much and she said I might have it for a nickel. Q. When and where did you give her the dime? A. I paid her when I got out of the car. Q. You got out of the car and gave her a dime? A. Yes. Q. When and where did you give her the nickel? A. After I got out of the car. Q. About the same time you gave the dime? A. Yes, sir. I think so. Not a very long space elapsed between. Q. You were standing outside the car, in any event? A. Yes, sir. Q. Was anything said between you and Mrs. Ash about the dime and nickel, what the dime and nickel were for? A. Yes, sir. Q. What was said? A. I said, 'How much do I owe you for the ride?' And she said, 'Oh, I don't know.' She said, 'How would a dime be?' And I said, 'that is all right with me if it is with you. I am willing to pay you more.' Q. Was there anything said before this time you say you gave her the dime about your paying Mrs. Ash for this ride? A. No."

On redirect examination, Mrs. Parrish further testified that for years it had been customary in that neighborhood for people with automobiles to carry fellow-workers to Kennewick and back, and to make a round trip charge of twenty-five cents therefor. The court admitted this testi-

mony, not for the purpose of establishing liability on the part of the appellants, but merely for the purpose of determining the reasonableness or unreasonableness of the amount alleged to have been paid by Mrs. Parrish to Mrs. Ash on the particular day.

Mrs. Mary McCalmant, who rode in the Ash car a short distance beyond the point where Mrs. Parrish had alighted, testified upon direct examination as follows:

"Q. Do you remember riding home from Kennewick on the day before this accident? A. Yes, sir. Q. Who did you ride with? A. Mrs. Ash. Q. Who else was along? A. Mrs. Parrish. Q. Did you pay Mrs. Ash anything for that ride? A. I gave her a dime. She didn't charge for it, I just gave it to her. Q. When was that? A. After I got home. Q. Did you see Mrs. Parrish pay Mrs. Ash her money? A. I saw her give her a dime. Q. Was that for the ride? MR. McKELVY: Objected to as leading. Q. You saw her give a dime? A. Yes, sir. Q. What was it for? A. I suppose for the ride. [On objection, the answer was stricken by the Court.] Q. What happened? A. Nothing. She just got out. Q. What was said? A. I don't remember too much. I was not paying much attention to them. I heard Mrs. Parrish ask if a dime would be alright for coming out. Q. What did Mrs. Ash say? A. She said she guessed so, it was alright with her. Q. Did Mrs. Parrish pay her? A. Yes."

On cross-examination, the witness testified:

"Q. Did you ask if you could have some of this bread? A. Yes, sir. Q. Did you take some bread? A. Yes, sir two loaves. Q. You got out after Mrs. Parrish got out? A. Yes. Q. Did Mrs. Parrish take a couple loaves of bread? A. I couldn't say for sure. She took one loaf, but I couldn't say if she got more than one. Q. Anyway, she took some bread? A. Yes, I couldn't say how much. I didn't pay no attention to the transaction at the time. Q. Did you see her, Mrs. Parrish give Mrs. Ash a dime? A. I saw her give her one dime. I guess it was a dime. I was on the other side of the car. Q. Did you see her give anything other than the dime? A. I don't know if she gave her any more or not. Q. As far as you know, that was all? A. I wasn't paying any attention. They got out the other side of the car. . . . Q. When did you ask for a couple of loaves of bread—did you say how much it would be worth? A. No, I didn't ask her. Q. Did you ask for the bread? A. Yes, I did. Q. Did Mrs. Parrish

ask for the bread? A. Yes. Q. Didn't you want to pay Mrs. Parrish [Ash] for the bread whatever she paid for it? A. I don't remember. I know I gave the lady a dime. I don't remember much about the conversation. Q. Ordinarily you don't take a loaf or a couple of loaves of bread for free, do you? A. That would depend on how much a person paid for it. Q. Particularly where you asked for it? As a matter of fact, she said you could have it for a nickel a loaf, didn't she? A. I couldn't say for sure as I don't remember what she said. Q. You intended to pay for those loaves of bread, in all fairness, didn't you? A. I suppose so, I don't remember much about it."

On redirect examination, Mrs. McCalmant testified further:

"Q. I want to go back to clear up something. Mrs. McCalmant, about the two loaves of bread you received from Mrs. Ash when she brought you home. A. Yes, sir. Q. You testified you paid Mrs. Ash ten cents for the ride home? Mr. McKelvy: Objected to as leading and suggestive. The Court: It is leading. Q. State whether or not you did pay Mrs. Ash for the ride home. A. Yes, sir. Q. Something was brought up about the bread. You testified you got two loaves of bread from Mrs. Ash? A. Yes, sir. Q. Did you pay anything for that bread? A. Not that I remember of. Q. Did you give her anything for it? A. I gave her some garden stuff. Q. When you got to your house, tell what happened. A. I just went out in the garden and gathered some beans and cucumbers. Q. She gave you the bread and you gave her the beans and cucumbers? A. I suppose that is the way you would state it."

Then, on recross-examination, the witness testified:

"Q. How did it happen that you gave Mrs. Ash a dime? A. Because I am accustomed to giving anyone I ride with— Q. Were you the one who decided how much it was? A. Yes, sir. Q. You decided it was a dime? A. I customarily— Q. Just answer the question, please. You decided it must be the dime? A. Yes, sir. Q. It was seven or eight miles? A. Yes, sir. Q. When did you first say anything to Mrs. Ash about going to give her a dime, when you got out or riding along? A. When I got home. Q. Was anything said before that at all of any arrangement whereby you would pay anything? A. No."

Mrs. Hazel Ash, one of the appellants herein, testified on behalf of herself and her husband, with reference to the occurrence on the day before the accident, as follows:

"Q. Getting back to the day before the accident, did Mrs. Parrish ride with you on that day? A. The day before? Q. Yes. A. Yes, she rode home. Q. Was Mr. Parrish with you on that day? A. No. Q. Had he ever been in your car before the accident? A. No. Q. Where did Mrs. Parrish ride on the day before the accident? A. Out to the mail boxes from town from Church's. Q. How did she happen to ride with you on that day? A. She didn't have any way home and asked if she could ride with me. Q. What did you say? A. Yes. Q. What was said on the 8th whether or not she should pay or compensate you for the ride? A. It was never mentioned. Q. Had Mrs. Parrish ever ridden with you before this time? A. Yes, she had. Q. Had she ever paid you? A. No, she had not. Q. Where had she ridden with you? A. This was about six years ago, I think worked at the Cannery and she rode home with me. Q. Have you ever picked her up to ride to town? A. No. Q. Did she ever compensate you in any way? A. No. Q. Who else was in your car on the 8th? A. Edna Brand, and May McCalmant, and Mrs. Parrish. Q. Who got out first? A. Edna Brand. Q. Where did she get out? A. I don't know how far, about three miles out I think as near as I can remember. Q. Did she pay you anything, compensate you? A. No. Q. Was there any arrangement with Mrs. Brand to pay you? A. No. Q. How did she happen to ride with you? A. She didn't have any way out and I said sure she could ride if she could find room. She sat in the back seat. Q. She sat with the bread? A. Yes. Q. When Mrs. Brand got out did she take any bread? A. No. Q. Did she pay you anything. A. No. Q. Mrs. Parrish was the next one to get out? A. Yes. Did she take any bread? A. Yes. Q. How much bread did she take? A. Two loaves. Q. Did she pay you anything? A. Yes. Q. How much? A. A nickel a loaf. Q. What was said about her paying for the bread? A. There was nothing said. Q. Did she say anything about what you wanted for the bread? A. Before she got out you mean? Q. Yes. A. No. When she got out she asked how much I wanted. Q. What did you say? A. A nickel a loaf. It was a day old, and I had the whole back end full. Q. Was it approximately what you paid for it? A. I *have* two and a half cents a pound for it. Sometimes they weigh it sometimes guess at it. Q. How much is in a large loaf of bread, do you know? A pound or pound and

a half? A. A little over a *point*, I do not remember exactly. Q. Were these large loaves? A. Yes, large loaves. Q. You had them in *our* car to take home to the chickens? A. Yes. Q. When Mrs. Parrish got out, was there anything said at all about her paying for the ride? A. No. Q. Did Mrs. Mc-Calmant take any bread? A. Yes. Q. Did she pay you? A. Yes. Q. How much did she pay you? A. A nickel a loaf. Q. How many loaves did she take? A. Two. Q. Did she pay you for transportation for taking her home? A. No, she didn't. Q. What was said between you and Mrs. McCalmant about the price of the bread? A. I don't know if we talked about it, I don't remember. Q. In any event, she gave you the same as Mrs. Parrish? A. Yes."

It will be borne in mind that the evidence thus far recited had reference to the events of September 8, 1947, which was the day before the accident here involved. It will also be noted that the question in dispute, under the evidence, was whether Mrs. Parrish paid Mrs. Ash a dime as compensation for transportation, in addition to what she paid for bread, or whether the amount paid by her was solely for the bread, and nothing for transportation.

Concerning the events of the following day, September 9th, there is no dispute. Early that morning, Mr. Parrish, proceeding alone, drove the Parrish car to Kennewick, expecting to resume work at the juice plant. Being informed, however, that there would be no work for him until the afternoon, he returned home. In the meantime, early that same morning, Mrs. Ash had learned, by telephone, that there would be no work for the women until the afternoon of that same day. Having been asked to notify the neighbors, she sent her husband over to communicate the information to Mrs. Parrish, and to tell her that Mrs. Ash would call for her at about noon of that day and would convey her to the plant in Kennewick. Pursuant to this arrangement, Mrs. Ash, at the agreed time, arrived with her car at the point where Mrs. Parrish had alighted the day before. Mr. and Mrs. Parrish, who were waiting at that point, intending to go to work that afternoon, thereupon got into the car, which then proceeded in the direction of Kennewick. The party had traveled but a short distance when, apparently

as the result of negligence on the part of Mrs. Ash, her automobile collided with a truck. In consequence of the collision, Mr. Parrish was killed instantly and Mrs. Parrish sustained severe injuries.

Up to the time of the collision, nothing had been said by any of the three persons about payment to Mrs. Ash for the transportation on that day, nor was there any testimony in the case relative to payment for such transportation on any future day. It will be recalled, however, that Mrs. Parrish testified that she had expected to pay for the ride on September 9th.

Appellants assign error upon the denial of their challenge to the sufficiency of the evidence, made at the close of respondent's case and renewed after both parties had rested; upon the denial of their motion for a directed verdict; upon the denial of their motion for judgment in their favor notwithstanding the verdict against them; upon the denial of their motion for a new trial; and upon the giving of a certain instruction.

A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the opposing party's evidence and all inferences that reasonably can be drawn therefrom and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the party against whom the motion is made. *Billingsley v. Rovig-Temple Co.*, 16 Wn. (2d) 202, 133 P. (2d) 265; *White v. Fenner*, 16 Wn. (2d) 226, 133 P. (2d) 270.

In the light of this rule, we are clearly of the opinion that there was sufficient evidence to warrant the jury in finding, as a fact, that at the end of the trip on September 8th, the day before the accident, Mrs. Parrish paid, and Mrs. Ash accepted as payment, the sum of ten cents as compensation for transporting Mrs. Parrish from the grape juice plant to her home. We are also of the opinion that a reasonable inference from all the evidence in the case is that Mrs. Parrish intended to pay, and Mrs. Ash expected to

receive, a proportionate amount of compensation for the transportation of Mr. and Mrs. Parrish from their home to the grape juice plant on the day of the accident, September 9th, and that a trier of the facts would have been warranted in so finding, as the jury evidently did find.

■ Whether we ourselves would have arrived at the same conclusion upon the same set of facts and the inferences to be drawn therefrom, is immaterial, for it is not our province to pass upon disputed questions of fact, other than to decide whether or not there is substantial evidence, rather than a mere scintilla, to support the jury's verdict.

■ It is for the jury to determine, from the evidence and upon proper instructions by the court, whether an amount paid, an article of property furnished, or a thing done was intended by the parties concerned as compensation for the transportation of a person by automobile, or whether on the contrary it was proffered and accepted merely as a gratuity or expression of appreciation for a favor extended.

"Where a dispute exists as to what were the respective purposes or conditions for or upon which the transportation was undertaken, relative to the nature and existence, if any, of the benefits conferred upon the respective parties, it is ordinarily a question of fact whether or not the invitee was a guest within the meaning of the statutes.

"Where, however, reasonable minds can reach but one conclusion from the uncontroverted facts, the question becomes one of law for the court." 4 Blashfield (Part 1), Cyclopedia of Automobile Law and Practice (Perm. ed.), 326, § 2292.

Cases supporting the principles stated in the foregoing quotation are the following: *Darling v. Dreamland Bedding & Upholstering Co.*, 44 Cal. App. (2d) 253, 112 P. (2d) 338; *Carey v. Oakland*, 44 Cal. App. (2d) 503, 112 P. (2d) 714; *Humphreys v. San Francisco Area Council, Boy Scouts of America*, 22 Cal. (2d) 436, 139 P. (2d) 941; *Knutson v. Lurie*, 217 Iowa 192, 251 N. W. 147; *Foley v. McDonald*, 283 Mass. 96, 185 N. E. 926; *Albrecht v. Safeway Stores*, 159

Ore. 331, 80 P. (2d) 62; *Richards v. Parks*, 19 Tenn. App. 615, 93 S. W. (2d) 639.

In one of its instructions, the trial court, after quoting the host and guest statute, Rem. Rev. Stat., Vol. 7A, § 6360-121, set forth above, stated:

"Payment for transportation means an actual or potential benefit in a material or business sense to the owner and driver of the car, and that the transportation was motivated by the expectation of such benefit. The transaction must be a business transaction between the parties and not an expression simply of courtesy or neighborliness between the parties.

"You will determine from all the evidence, facts and circumstances whether the plaintiffs [respondent] had paid or were to pay for such transportation or whether they were invited guests or licensees.

"If you find that they were guests or licensees, your verdict must be for the defendants [appellants].

"If you find that there was an agreement, expressed or implied, by which plaintiff had paid or was to pay for such transportation then the provision of the above law would not apply to this case and the defendants would be liable to the plaintiff for any negligence that was the proximate cause of the accident."

No error is assigned upon this instruction, and it appears to be in complete accordance with the rules stated in *Syverson v. Berg*, 194 Wash. 86, 77 P. (2d) 382; *Fuller v. Tucker*, 4 Wn. (2d) 426, 103 P. (2d) 1086; and *Scholz v. Leuer*, 7 Wn. (2d) 76, 109 P. (2d) 294.

Under the evidence and the law as thus expounded, the jury could with propriety find, as it evidently did find, that the payment of ten cents for the transportation on September 8th was made in a business sense, or as part of a business transaction, not as an expression of courtesy or neighborliness, and, further, that the transportation rendered on the following day was motivated by an expectation of a similar payment for the transportation on that day.

Appellants' final assignment of error is addressed to an instruction given by the trial court, reading as follows:

"If there is payment for the transportation, the law regarding a guest that the court has given you would not

apply. This does not mean that there must necessarily be payment in money nor that the payment must have been made before the accident happened. It is sufficient that there was an intention on the part of Mr. and Mrs. Parrish and Mrs. Ash that said transportation would be paid for. This intention may be gathered from the direct testimony of witnesses or may be inferred from the facts and circumstances of the case."

Appellants assign error upon this instruction, contending that there must not only have been an *intention* on the part of the parties that the transportation was to be paid for, but also there must have been an enforcible contract between the parties to that effect. The assignment of error is not well taken.

It is true that the relationship of carrier and passenger may, and often does, arise out of contract. However, to avoid the bar of the host and guest statute it is not an essential element that there be an enforcible contract with respect to transportation. *Scholz v. Leuer, supra; Engel v. Interstate Transit Co.*, 9 Wn. (2d) 590, 115 P. (2d) 681; *Coerver v. Haab*, 23 Wn. (2d) 481, 161 P. (2d) 194, 161 A. L. R. 909.

In the *Scholz* case, *supra*, we quoted from 4 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.), 80 [307], § 2292, as follows:

" 'One important element in determining whether a person is a guest within the meaning and limitations of such statutes is the identity of the person or persons advantaged by the carriage. If, in its direct operation, it confers a benefit only on the person to whom the ride is given, and no benefits other than such as are incidental to hospitality, companionship, or the like, upon the person extending the invitation, the passenger is a guest within the statutes; but, if his carriage tends to the promotion of mutual interests of both himself and the driver and operates for their common benefit or if it is primarily for the attainment of some objective or purpose of the operator, he is not a guest within the meaning of such enactments.' "

Continuing with its discussion of the case, this court said:

"When the court is called upon to decide whether or not the statute applies to a certain factual situation, the prob-

lem, after all, is not primarily to classify or definitely identify the relationship between the operator and the occupant, but to determine whether or not the occupant was an invited guest or licensee within the purview of the statute. For the purposes of the instant case, the meaning of the words 'invited guest or licensee' can best be ascertained by considering them in connection with the phrase which immediately follows in the statute, that is, 'without payment for such transportation.' The qualifying phrase limits the scope of 'invited guest or licensee' by indicating plainly that gratuitous carriage only is intended. If there is payment for the transportation, the statute does not apply, and this does not mean that payment must necessarily be made in money. It is sufficient if the presence of the occupant directly compensates the operator or owner in a substantial and material or business sense, as distinguished from mere social benefit or nominal or incidental contribution to expenses."

Then, near the conclusion of its opinion, this court said further:

"As has been pointed out, where the relationship between the driver of a car and an occupant is not that of joint adventure, a prior contract between them is not essential to avoid the bar of the statute under the benefit rule."

Since, in this case, the jury could have found, and evidently did find, that the parties to this action intended that the transportation should be paid for, the case does not come within the host and guest statute, regardless of whether or not there was a prior enforcible contract for such transportation.

The judgment is affirmed.

JEFFERS, C. J., BEALS, MALLERY, and SCHWELLENBACH, JJ., concur.

HILL, ROBINSON, SIMPSON, and GRADY, JJ., dissent.

----

April 18, 1949. Petition for rehearing denied.