[No. 6762-5-II.   Division Two.   August 21, 1985.]

LINDELL LUMAN BROWN, ET AL, *Appellants,* v. ARNE
DAHL, ET AL, *Respondents.*

*Stephen W. Fisher* and *Tuell, Anderson & Fisher,* for appellants.

*Allan R. Billett, Todd M. Worswick,* and *Billett, Comfort & Rosenow,* for respondents.

PETRICH, J.—Lindell L. Brown and his wife, Edith, appeal from a jury verdict for the defendants in a medical malpractice case and the trial court's dismissal of their informed consent claim for relief. The issues on appeal are whether (1) the court erred by dismissing plaintiffs' informed consent claim for relief; (2) the court improperly instructed as to the standard of care for health care providers; (3) the court's instructions as a whole overemphasized defendants' theory of the case; and (4) the court erred by refusing to instruct on the doctrine of res ipsa loquitur. We reverse and remand.

On the afternoon of February 24, 1980, Mr. Brown

entered Harrison Memorial Hospital in Bremerton for exploratory surgery to be performed the following day. When Mr. Brown checked into the hospital, he signed several admission forms, including one that indicated he was aware of risks associated with anesthesia and consented to anesthesia. After completing the forms, which took about 15 to 20 minutes, Mr. Brown was sent by the admissions secretary to consult with Dr. Dahl, one of the defendants, for a preanesthetic evaluation. While waiting to meet with Dr. Dahl, Mr. Brown completed a preanesthetic evaluation "checklist." Mr. and Mrs. Brown testified that during the ensuing consultation, Dr. Dahl told them that he recommended a general anesthetic procedure (sodium pentothal) for the surgery and would personally perform the proposed procedure. They also testified that although Dr. Dahl asked them whether they had any questions about the proposed anesthetic procedure, he did not disclose any of the risks associated with the proposed procedure nor any of the available alternative anesthetic procedures.

Mr. Brown was taken to the operating room the following morning where he was met by codefendant Susan Korte, a nurse anesthetist. She testified that she explained to Mr. Brown that she was going to perform the general anesthetic procedure and that Mr. Brown voiced no complaints about her performing the procedure or to the absence of Dr. Dahl.

After completing standard preanesthetic preparations and selection of the anesthetic agents, Nurse Korte began to administer general anesthesia to Mr. Brown. As the anesthetic began to take effect, Mr. Brown's airway became partially blocked and he experienced difficulties in breathing. Nurse Korte attempted corrective measures that proved unsuccessful. She then called for help. The elapsed time between Nurse Korte's first discovery of Mr. Brown's breathing problems to when she first called for help was a hotly contested issue at trial. Within moments after Nurse Korte's call for help, several doctors arrived at the scene, including Dr. Dahl.

After several attempts, doctors were successful in estab-

lishing an airway for Mr. Brown. Shortly thereafter, however, Mr. Brown sustained a cardiac arrest. Plaintiffs presented evidence to establish that as a result of the cardiac arrest, Mr. Brown suffered significant mental and physical impairments.

Plaintiffs instituted this action alleging (1) violation of the informed consent doctrine, (2) negligence by Dr. Dahl in the preanesthetic evaluation of Mr. Brown and in allowing Nurse Korte to perform the anesthetic procedure and by being absent during the procedure after informing plaintiffs he would personally perform it, and (3) negligence by Nurse Korte in her administration of the anesthesia, attempts at corrective measures, and delay in calling for help.

At the close of plaintiffs' case, the court dismissed plaintiffs' informed consent cause of action and the negligence action against Dr. Dahl. The court found sufficient evidence of Nurse Korte's negligence to present this issue to the jury, and further instructed that Dr. Dahl would be responsible for Nurse Korte's negligence if the jury found that he had indeed promised to perform the anesthetic procedure personally.[1] The jury returned a verdict in favor of defendants, and plaintiffs now appeal.

We first address whether the court erred by dismissing plaintiffs' informed consent cause of action. RCW 7.70.050[2]

---

[1]The trial court's instruction relating to Dr. Dahl's vicarious liability, premised on whether he personally promised to perform the anesthetic procedure, has not been appealed.

[2]RCW 7.70.050 provides:

"(1) The following shall be necessary elements of proof that injury resulted from health care in a civil negligence case or arbitration involving the issue of the alleged breach of the duty to secure an informed consent by a patient or his representatives against a health care provider:

"(a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;

"(b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;

"(c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;

sets forth the elements plaintiffs are required to prove in order to establish a breach of the informed consent doctrine. Further, because they signed a consent to anesthesia form, plaintiffs have the burden of rebutting the presumption of having given their informed consent. RCW 7.70.060.[3]

The doctrine of informed consent refers to the requirement that a physician, before obtaining the consent of his or her patient to treatment, inform the patient of

---

"(d) That the treatment in question proximately caused injury to the patient.

"(2) Under the provisions of this section a fact is defined as or considered to be a material fact, if a reasonably prudent person in the position of the patient or his representative would attach significance to it deciding whether or not to submit to the proposed treatment.

"(3) Material facts under the provisions of this section which must be established by expert testimony shall be either:

"(a) The nature and character of the treatment proposed and administered;

"(b) The anticipated results of the treatment proposed and administered;

"(c) The recognized possible alternative forms of treatment; or

"(d) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment administered and in the recognized possible alternative forms of treatment, including nontreatment.

"(4) If a recognized health care emergency exists and the patient is not legally competent to give an informed consent and/or a person legally authorized to consent on behalf of the patient is not readily available, his consent to required treatment will be implied."

[3]RCW 7.70.060 provides:

"If a patient while legally competent, or his representative if he is not competent, signs a consent form which sets forth the following, the signed consent form shall constitute prima facie evidence that the patient gave his informed consent to the treatment administered and the patient has the burden of rebutting this by a preponderance of the evidence:

"(1) A description, in language the patient could reasonably be expected to understand, of:

"(a) The nature and character of the proposed treatment;

"(b) The anticipated results of the proposed treatment;

"(c) The recognized possible alternative forms of treatment; and

"(d) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment and in the recognized possible alternative forms of treatment, including nontreatment;

"(2) Or as an alternative, a statement that the patient elects not to be informed of the elements set forth in subsection (1) of this section.

"Failure to use a form shall not be admissible as evidence of failure to obtain informed consent."

the treatment's attendant risks. The doctrine is premised on the fundamental principle that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body". A necessary corollary to this principle is that the individual be given sufficient information to make an *intelligent* decision.

(Citations omitted.) *Smith v. Shannon,* 100 Wn.2d 26, 29, 666 P.2d 351 (1983). The *Shannon* court reemphasized that it is for the patient to evaluate the risks of treatment and that the physician's only role is to provide the patient with information as to what those risks are.

> The patient is endowed with the right to know each hazard which the usual person would utilize in reaching his decision. When a reasonable person in the patient's position probably would attach significance to the specific risk in deciding on treatment, the risk is material and must be disclosed.

*Smith v. Shannon,* 100 Wn.2d at 31, quoting *Miller v. Kennedy,* 11 Wn. App. 272, 287, 522 P.2d 852 (1974), *aff'd per curiam,* 85 Wn.2d 151, 152, 530 P.2d 334 (1975). However,

> The doctrine does not place upon the physician a duty to explain all possible risks, but only those of a serious nature. The guide for disclosure is the test of materiality, which is an objective one, but incorporates the underlying concept of "patient sovereignty". That is, if the reasonable person in the patient's position would attach significance to a risk in deciding treatment, the risk is material. The duty to disclose similarly attaches to recognized possible alternative forms of treatment and to the anticipated results of the treatment proposed and administered.

(Footnotes and citations omitted.) *Adams v. Richland Clinic, Inc., P.S.,* 37 Wn. App. 650, 656–57, 681 P.2d 1305 (1984). *See Smith v. Shannon, supra.*

While "'[t]he testimony of medical experts is not necessary to establish the duty to disclose'" (*Shannon,* 100 Wn.2d at 32, quoting *Miller,* 11 Wn. App. at 285), "*Miller* expressly recognizes that customary practice may be considered as evidence." *Shannon,* 100 Wn.2d at 35, citing

*Miller,* 11 Wn. App. at 288 n.10. Moreover, "expert testimony is thus necessary to prove materiality [of certain facts. RCW 7.70.050]. Specifically, expert testimony is necessary to prove the existence of a risk, its likelihood of occurrence, and the type of harm in question." *Shannon,* 100 Wn.2d at 34. Once materiality is established, however, "expert testimony is of secondary importance" and it is for the jury "to place themselves in the position of a patient and decide whether, under the circumstances, the patient should have been told." *Shannon,* 100 Wn.2d at 32, quoting *Miller,* 11 Wn. App. at 288–89.

> The determination of materiality is a 2–step process. Initially, the scientific nature of the risk must be ascertained, *i.e.,* the nature of the harm which may result and the probability of its occurrence. The *trier of fact* must then decide whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment.

(Citations omitted. Italics ours.) *Smith v. Shannon,* 100 Wn.2d at 33.

Here, plaintiffs presented expert testimony to establish that blocked airways, respiratory problems, cardiac arrest, and brain damage are risks associated with general anesthesia. Expert testimony also established that the risk of a blocked airway leading to respiratory problems was a relatively common one. Expert testimony also established the existence of various alternatives to general anesthesia, including regional, local, and no anesthesia. While evidence of the risks and benefits associated with these various alternatives as compared to the risks and benefits associated with general anesthesia could have been more fully developed, *see* RCW 7.70.050(2) and (3)(d), some evidence of risks and benefits associated with the various alternatives was presented.[4] The evidence also established that

---

[4]There is expert testimony in the record that certain risks of regional anesthesia include cardiac arrest, paralysis, and a longer recovery period than general anesthesia. There is also expert testimony that a risk of local anesthesia is "referred pain from the testicle and it may be difficult to get an adequate anes-

Mr. Brown underwent successful regional anesthesia without any complications when eventually the exploratory surgery was performed. Moreover, there was expert testimony that Dr. Dahl did not elicit sufficient preanesthetic information from Mr. Brown to assess adequately his candidacy for general anesthesia or provide the anesthesiologist performing the anesthetic procedure with sufficient information to handle adequately the type of emergency experienced. Finally, both of plaintiffs' experts opined that Dr. Dahl violated the customary practice in regard to informed consent by his failure to apprise the Browns of the risks of general anesthesia and of the available alternatives.

As for rebutting the presumption raised by signing the consent form, Mr. Brown testified that he only signed the consent form during the admissions process because "the little girl told me if I didn't sign it I wouldn't get the job done, so I signed the paper." Both Mr. and Mrs. Brown testified that Dr. Dahl did not disclose any risks of general anesthesia or any of the available alternatives. Dr. Dahl also admitted the same, claiming he did not want to "frighten" the patient with these facts. Plaintiffs' expert also testified that the consent form signed by Mr. Brown was deficient in its conveyance of information regarding the availability of alternatives.[5]

Notwithstanding the above evidence, the trial court granted Dr. Dahl's motion to dismiss plaintiffs' informed consent action on the grounds that (1) Mr. Brown failed to

---

thesia . . ." Finally, when granting the motion to dismiss plaintiffs' informed consent cause of action, the trial court recognized that evidence of the risks of the various alternative procedures had been presented: "[t]he testimony affirmatively shows, the medical testimony, the expert testimony was that the risks of other forms of anesthesia were just as great or perhaps greater than they were with the general anesthetic."

[5]Plaintiffs do not contend that the information contained in the consent form was so deficient that no presumption should arise, but, rather, that such deficiency in information provides evidence to rebut the presumption of having given their informed consent.

testify that he would have chosen an alternative treatment had he been apprised of the risks of general anesthesia and the available alternatives, and (2) the expert testimony did not establish that the risks associated with general anesthesia were any greater than the risks associated with the available alternatives.

█ █ Our review of the trial court's dismissal of the informed consent claim is governed by the following principles:

> The rule in this jurisdiction applying to challenges to the sufficiency of evidence in jury cases was aptly stated in *Hellriegel v. Tholl,* 69 Wn.2d 97, 98, 417 P.2d 362 (1966), wherein this court stated:
>
>> The rule which the trial court must apply in passing on a motion for a nonsuit is stated in *Parrish v. Ash,* 32 Wn.2d 637, 648, 203 P.2d 330 (1949). It reads:
>>
>>> A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the opposing party's evidence and all inferences that reasonably can be drawn therefrom and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the party against whom the motion is made. *Billingsley v. Rovig–Temple Co.,* 16 Wn. (2d) 202, 133 P. (2d) 265; *White v. Fenner,* 16 Wn. (2d) 226, 133 P. (2d) 270.
>
> *See also Lockett v. Goodill,* 71 Wn.2d 654, 656, 430 P.2d 589 (1967); *Brant v. Market Basket Stores, Inc.,* 72 Wn.2d 446, 433 P.2d 863 (1967); *Smith v. B & I Sales Co.,* 74 Wn.2d 151, 443 P.2d 819 (1968).
>
> From the foregoing, it is clear that, where there are justifiable inferences from the evidence upon which reasonable minds might reach different conclusions, the questions are for the jury and not for the court to decide. No element of discretion is lodged in the trial court in such matters unless it can be held as a matter of law that there is no evidence or reasonable inference therefrom to sustain a verdict for the opposing party. *Miller v. Payless Drug Stores,* 61 Wn.2d 651, 379 P.2d 932 (1963).

*Holland v. Columbia Irrig. Dist.,* 75 Wn.2d 302, 304, 450 P.2d 488 (1969). We believe the record in this case presents

sufficient facts to withstand a motion to dismiss, and that the grounds for dismissal stated by the trial court were inappropriate. We disagree that Mr. Brown's failure to testify that he would have chosen a different course of treatment is a sufficient ground for dismissal. The test is not whether Mr. Brown himself would have chosen a different course of treatment, but whether a reasonably prudent patient in Mr. Brown's position would have chosen a different course of treatment. *Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 323, 622 P.2d 1246 (1980); *see Smith v. Shannon*, 100 Wn.2d at 32–34; *Miller v. Kennedy*, 11 Wn. App. at 290. In fact, it has been stated that subjective testimony of the patient (that he would not have submitted to the treatment received) should be considered only with appropriate limitations upon its self–serving aspects. *Holt v. Nelson*, 11 Wn. App. 230, 236, 523 P.2d 211 (1974).

We also disagree that no evidence was presented from which to infer that the risks of general anesthesia are greater than the risks of the available alternatives, or that plaintiffs were even required to present such evidence. As previously noted, there was evidence from which it is reasonable to infer that a reasonably prudent patient in Mr. Brown's situation might have chosen another form of anesthesia than general anesthesia. Additionally, there was expert testimony that Dr. Dahl violated the customary standard in obtaining an informed consent and that the consent form signed by Mr. Brown inadequately informed him of the risks and alternatives. Thus, the record contains evidence from which a jury could conclude that a reasonably prudent patient under similar circumstances would have selected an alternative course of treatment, that there were risks of following these alternatives, and that the patient was not adequately informed concerning the risks or benefits of the treatment administered here as well as those of the alternative treatments. *See Archer v. Galbraith*, 18 Wn. App. 369, 376, 567 P.2d 1155 (1977).

Finally, RCW 7.70.050 does not require expert testimony that the risks of the alternatives be less than the treatment

administered. Although RCW 7.70.050(3)(d) defines as a material fact "[t]he recognized serious possible risks, complications, and anticipated benefits involved in the treatment administered and in the recognized possible alternative forms of treatment, including nontreatment", the provision does not require expert testimony that the risks of the proposed treatment be greater than the risks of the available alternatives. RCW 7.70.050(3)(d) sets forth only one of several material facts which can only be established by expert testimony. Other material facts requiring expert testimony are (1) the nature and character of the proposed treatment, RCW 7.70.050(3)(a); and (2) the recognized possible alternative forms of treatment, RCW 7.70-.050(3)(c), both which have been established by expert testimony in the present case. While evidence to the effect that the risks of the treatment administered exceeded the risks of the available alternatives would undoubtedly be considered a material fact to any "reasonably prudent person", *see* RCW 7.70.050(2), such evidence is not statutorily required to be produced. Once it has been established that "(a) [t]he health care provider failed to inform the patient of a material fact or facts relating to the treatment", RCW 7.70.050(1)(a), and "(b) [t]hat the patient consented to the treatment without being aware of or fully informed of such material fact or facts", RCW 7.70.050(1)(b), the trier of fact then determines whether "a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts", RCW 7.70.050(1)(c), and whether "the treatment in question proximately caused injury to the patient." RCW 7.70-.050(1)(d). *Smith v. Shannon,* 100 Wn.2d at 32–33; *Keogan v. Holy Family Hosp.,* 95 Wn.2d at 321–23. *See Adams v. Richland Clinic, Inc., P.S.,* 37 Wn. App. at 660.

> While it may be that the testimony as a whole indicated that the prudent course of action was to remove the nodule surgically, this decision was not a decision to be made by the physician but by the patient. The totality of the evidence permits an inference that had the patient

been informed of the alternative treatment, though risky, a reasonably prudent patient would have chosen that course. *See ZeBarth v. Swedish Hosp. Medical Center,* 81 Wn.2d 12, 31, 499 P.2d 1, 52 A.L.R.3d 1067 (1972). A jury question was presented on that issue.

*Archer v. Galbraith,* 18 Wn. App. at 378.

Here, plaintiffs presented evidence that they consented to treatment without being informed of certain material facts. We believe this evidence presents a jury question as to whether the magnitude of the nondisclosed material facts was sufficiently developed such that a reasonably prudent patient would have chosen a different treatment. Accordingly, we hold that there is sufficient evidence of a lack of disclosure of material facts to entitle plaintiffs to present their informed consent action to the jury under appropriate instructions providing that plaintiffs have the burden of rebutting the presumption of having given their informed consent. *See Adams v. Richland Clinic, Inc., P.S., supra,* wherein the court reversed the trial court's direction of a verdict for defendants in an informed consent action even though plaintiff had signed a consent form.

■ We now address the propriety of the court's instructions pertaining to the standard of care in plaintiffs' remaining medical negligence action. Plaintiffs contend the court's instructions 5, 11, 13, 15, and 16,[6] taken as a whole,

---

[6]Instruction 5 provides:

"The basis of this action is negligence as against the defendants and before the plaintiff is entitled to recover, the burden is upon him to prove by a fair preponderance of the evidence that the defendant was negligent in one or more particulars as contended by plaintiff and further, that because of such negligence the plaintiff suffered injuries and damages as a proximate cause [*sic*] thereof.

"Negligence of a physician and surgeon and nurse anesthetist is a failure to exercise that reasonable degree of care, diligence and skill which is ordinarily possessed and exercised by the average physician and surgeon and nurse anesthetist engaged in the same line of practice in the class to which the defendants belong, acting in the same or similar circumstances. It consists in doing some act which a physician or surgeon or nurse anesthetist would not do under the same or similar circumstances, or in failing to do something which such a physician or surgeon or nurse anesthetist would have done under the same or similar circumstances. Unless you find from the evidence in this case that the defendants failed to exercise that degree of care, diligence and professional skill, which is ordinarily pos-

improperly phrased a health care provider's standard of care in terms of "average," "reasonable," or "ordinary" care

sessed and exercised by the average members of the medical profession engaged in the same line of practice, acting in the same or similar circumstances, the plaintiff is not entitled to recover against such doctors or nurse anesthetist."

Instruction 11 provides:

"I will summarize for you the general rules of law governing actions for malpractice.

"(1) An individual licensed to practice medicine is presumed to possess that degree of skill and learning which is possessed by the average member of the profession in the community in which he practices.

"(2) The contract which the law implies from the employment of a physician or a surgeon or nurse anesthetist is that the doctor or nurse anesthetist will treat the patient with that diligence and skill just mentioned.

"(3) He does not incur liability for his mistakes if he has used methods recognized and approved by those reasonably skilled in the profession.

"(4) Before a physician or surgeon or nurse anesthetist can be held liable for malpractice, he must have done something in the treatment of his patient which the recognized standard of medical practice forbids, in such cases, or he must have neglected to do something required by those standards.

"(5) In order to sustain a judgment against a physician or surgeon or nurse anesthetist, the standard of medical practice must be shown, and further, that the doctor or nurse anesthetist failed to follow the methods prescribed by that standard.

"(6) It is not required that physicians and surgeons and nurse anesthetists guarantee results, nor that the results be what is desired."

Instruction 13 provides:

"In this case, the plaintiff claims that the defendants failed to follow the standard of care of the average medical practitioner in the class to which the defendants belong. You are instructed that plaintiff must prove by expert medical testimony what the standard of care is for a practicing physician and surgeon and a nurse anesthetist in a class to which the defendants belong at the time here in question."

Instruction 15 provides:

"A physician and surgeon and a nurse anesthetist are not to be judged in the light of any after–acquired knowledge in relation to the case, and the question of whether or not they exercised reasonable care and skill, as defined in these instructions, is to be determined by reference to what is known in relation to the case at the time of treatment or examination, that is to say, in this case, in February, 1980, and must be determined by reference to the pertinent facts then in existence of which he knew, or in the exercise of ordinary care should have known."

Instruction 16 provides:

"A party is not bound to guard against or take measures to avert that which, under the circumstances, a reasonably prudent person would not anticipate as likely to happen. In order for a party to be found negligent for failing to take certain measures to avert an occurrence, it must first be established, in the exercise

and, therefore, the jury was allowed to apply an implicitly lower standard of care than is required by statute and case law. Under RCW 4.24.290[7] and RCW 7.70.040,[8] which govern negligence actions against health care providers, a health care provider has a duty to exercise that degree of care, skill, and learning possessed, rather than actually practiced, by a reasonably prudent practitioner of the same profession under the same or similar circumstances. *Harris v. Groth,* 99 Wn.2d 438, 443–47, 663 P.2d 113 (1983). The court's standard of care instructions clearly do not conform to the "reasonable prudence" standard set forth in RCW 4.24.290, RCW 7.70.040, and *Harris v. Groth, supra,*[9] as the court's insertion of the terms "average" and "ordinary" allowed the jury to apply a lower standard than the "reasonable prudence" standard. However, although plaintiff excepted to the court's standard of care instructions for the above stated reasons, plaintiffs failed to except to the court's refusal to give a properly worded instruction or to

---

of reasonable care, the parties should have foreseen that the occurrence would probably, rather than possibly, happen."

[7]RCW 4.24.290 provides in pertinent part:

"In any civil action for damages based on professional negligence . . ., the plaintiff in order to prevail shall be required to prove by a preponderance of the evidence that the defendant or defendants failed to exercise that degree of skill, care, and learning possessed at that time by other persons in the same profession, and that as a proximate result of such failure the plaintiff suffered damages, but *in no event shall the provisions of this section apply to an action based on the failure to obtain the informed consent of a patient.*"

[8]RCW 7.70.040 provides:

"The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:

"(1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances;

"(2) Such failure was a proximate cause of the injury complained of."

[9]WPI 105.01, 6 Wash. Prac. 31 (Supp. 1984) sets forth a proper form of a general reasonable prudence instruction. *See Harris v. Groth,* 99 Wn.2d at 448 n.5.

set forth verbatim in their brief a proper instruction on this issue. A party who is entitled to a certain instruction on a particular issue has the duty of providing the court with an instruction which accurately states the applicable law and must except to the court's refusal to give the proposed instruction. *Harris,* 99 Wn.2d at 447–48. Thus, if the only issue with the court's standard of care instructions was whether the instructions improperly set forth the standard of care, we would affirm on the basis that plaintiffs failed to properly preserve this issue for appeal.

    Nevertheless, another issue pertaining to these same instructions has properly been preserved for appellate review. Plaintiffs contend the court's standard of care instructions (instructions 5, 11, 13, 15 and 16), taken as a whole, overemphasized defendants' case to the point of prejudicing plaintiffs' case.

> When the instructions as a whole so repetitiously cover a point of law or the application of a rule as to grossly overweigh their total effect on one side and thereby generate an extreme emphasis in favor of one party to the explicit detriment of the other party, it is, we think, error—even though each instruction considered separately might be essentially correct. Thus, if the instructions on a given point or proposition are so repetitious and overlapping as to make them emphatically favorable to one party, the other party has been deprived of a fair trial.

*Samuelson v. Freeman,* 75 Wn.2d 894, 897, 454 P.2d 406 (1969). Here, the number and type of instructions given by the trial court regarding the defendants' standard of care are strikingly similar to those held to be unduly overemphasized in *Samuelson v. Freeman,* 75 Wn.2d at 896. We hold likewise that the court's instructions on the standard of care overemphasized defendants' case and deprived plaintiffs of a fair trial. Accordingly, we reverse and remand for a new trial on plaintiffs' medical negligence action under instructions that accurately set forth the proper standard of care and do not unduly overemphasize the

defendants' theory of the case.

■ Plaintiffs' final contention is that the court erred by refusing to give their proposed instruction on the doctrine of res ipsa loquitur.[10] This court has previously stated:

It is clear that res ipsa loquitur can be applicable to physicians. *ZeBarth v. Swedish Hosp. Medical Center,* 81 Wn.2d 12, 499 P.2d 1, 52 A.L.R.3d 767 (1972). Whether the doctrine applies in a given situation is a question of law. *Zukowsky v. Brown,* 79 Wn.2d 586, 488 P.2d 269 (1971). Three elements are necessary for the application of res ipsa loquitur: (1) the occurrence producing the injury must be of a kind which ordinarily does not occur in the absence of negligence; (2) the injury is caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the injury–causing occurrence must not be due to any contribution on the part of the plaintiff. *Zukowsky v. Brown, supra; Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wn.2d 351, 382 P.2d 518 (1963).

There are three situations when the first element is established: (1) when the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.,* leaving foreign objects, sponges, scissors, and so forth, in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric

---

[10]Plaintiffs' proposed instruction 26 which essentially adopted the court's instruction 4 describing direct and circumstantial evidence, but included the following additional material, namely:

"In connection with the foregoing, it is for you to determine whether the matter of the occurrence of the injuries sustained by the Plaintiff and the attendant circumstances connected therewith are of such character as would, in your judgment, warrant an inference that the injury would not have occurred if that degree of skill, care and learning of a reasonably prudent anesthesiologist or nurse anesthetist had been exercised by the defendant.

"When an agency or instrumentality which produces injury is under the control of a Defendant at the time of injury or damage to Plaintiff, and the injury or damage which occurred would ordinarily not have resulted if the Defendant had used that degree of skill, care and learning of a reasonably prudent anesthesiologist or nurse anesthetist had been, then, in the absence of satisfactory explanation, you may infer, but you are not required to infer, that the Defendant was negligent and that such negligence produced the injury complained of by the Plaintiff."

field creates an inference that negligence caused the injuries. *ZeBarth v. Swedish Hosp. Medical Center, supra; Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc., supra.*

*Swanson v. Brigham,* 18 Wn. App. 647, 649–50, 571 P.2d 217 (1977). Here, there is little dispute but that the last two elements are established.[11] In order to establish the first element, plaintiffs presented expert testimony to the effect that the extent of the complications experienced by Mr. Brown ordinarily do not occur in the absence of negligence.[12] Notwithstanding the presentation of this evidence, the trial court refused plaintiffs' proposed res ipsa instruction on the ground that the doctrine only applied to unexplained accidents ("a big blank") and was inappropriate in

---

[11]At oral argument, defendants argued that they did not have exclusive control over Mr. Brown's airway and therefore, res ipsa does not apply. We disagree. We believe that defendants had exclusive control over both Mr. Brown's unconscious body and the apparatus that administered the general anesthesia. At no time did defendants contend that plaintiffs contributed to the injury–causing occurrence.

[12]One of plaintiffs' experts testified:

Q. [By plaintiffs' counsel]. In your practice as an anesthesiologist and with patients in a healthy position, comparable to Mr. Brown, have you ever had a patient who has a blocked airway resulting in cardiac arrest? [Overruled objection].

A. No.

Q. Do you have an opinion as to whether the complications experienced by Mr. Brown ordinarily occur when there is no negligence on the part of the health care provider? [Overruled objection].

A. With reasonable medical certainty, that is to say?

Q. [By plaintiffs' counsel]. Yes.

A. Greater probability of not happening. I would say they do not.

Q. What do you base that opinion on?

A. My personal experience, my attendance at morbidity and mortality conferences at other institutions.

Defendants' argument claiming insufficiency of the evidence to support the proposition that the result experienced here does not happen in the absence of negligence is undermined by defense counsel's acknowledgment that that was precisely the substance of one of the plaintiff doctor's testimony when during the course of cross examination defense counsel stated: "Doctor, I think you answered a question, that you said, 'These things more likely than not do not occur unless someone is negligent.'" Furthermore, it is obvious that the trial court recognized the sufficiency of the expert testimony on this issue. (See footnote 13.)

cases, such as here, where evidence is presented in an attempt to explain an occurrence.[13] Defendants further contend on appeal that a res ipsa instruction is inappropriate because res ipsa is properly treated the same as circumstantial evidence. Under *ZeBarth v. Swedish Hosp. Med. Ctr.,* 81 Wn.2d 12, 499 P.2d 1, 52 A.L.R.3d 1067 (1972), the trial court's ground for denying plaintiff's res ipsa instruction, *i.e.,* that evidence was presented to explain the incident, is not a proper ground for denying the instruction when, as here, all of the elements for application of the doctrine are present.

> Res ipsa loquitur does not, and did not here, operate to deprive defendant hospital of its defense on the merits. Inferences of negligence arising from the doctrine and evidence were met with persuasive evidence to the contrary. But, although defendant presented weighty, competent and exculpatory proof of due and reasonable care and prudence, the ultimate issue of fact was one for the jury to decide.

*ZeBarth v. Swedish Hosp. Med. Ctr.,* 81 Wn.2d at 22. Here, the fact that defendants "presented weighty, competent and exculpatory proof of due and reasonable care and prudence" does not prevent plaintiffs from presenting their theory of res ipsa loquitur. *ZeBarth.* When, as here, each of the elements of res ipsa loquitur are supported by substantial evidence, including an inference from expert medical testimony that negligence caused the injury to the patient, plaintiffs are entitled to a res ipsa loquitur instruction. *Miller v. Kennedy,* 11 Wn. App. 272, 279, 522 P.2d 852 (1974), *aff'd per curiam,* 85 Wn.2d 151, 530 P.2d 334 (1975). *Miller* further recognized that "[t]he currently pre-

---

[13]The trial court stated on the record:

"The Court's questions concerning res ipsa telegraphed the Court's opinion on that, and certainly res ipsa loquitur is a proper theory of the law. The Court will decline to instruct on it because I don't think it's necessary here. I think the facts, good and bad, plaintiffs and defendants, are out on the table.

"Likewise, I'm very much aware of the testimony of two doctors who in effect testified something along the lines of that in the absence of negligence, this normally would not occur."

vailing trend of the Washington cases would instruct the jury that it could infer negligence when the plaintiff's evidence supports the deduction that the injury would not have occurred otherwise." *Miller v. Kennedy,* 11 Wn. App. at 278. Our Supreme Court has approved and adopted the reasoning of *Miller* in its affirmance by per curiam opinion. *See Miller v. Kennedy,* 85 Wn.2d 151, 152, 530 P.2d 334 (1975).

Although *Zukowsky v. Brown,* 79 Wn.2d 586, 488 P.2d 269 (1971) indicates that res ipsa instructions should not be given and that the theory is adequately covered by a circumstantial evidence instruction, it is clear from *ZeBarth* and *Miller,* both of which postdate *Zukowsky,* that plaintiffs were entitled to an instruction setting forth their theory of res ipsa loquitur, and it was error for the court to deny their properly requested instruction. *See* the dissent in *ZeBarth.*

Judgment is reversed and remanded for a new trial consistent with this opinion.

REED, A.C.J., and ALEXANDER, J., concur.

After modification, further reconsideration denied November 14, 1985.