[No. 38092.   Department One.   July 28, 1966.]

DIETER W. HELLRIEGEL, *Individually and as Guardian, Appellant*, v. JOHN THOLL *et al., Respondents.*[*]

*Breskin, Rosenblume & Robbins* and *Arnold B. Robbins*, for appellant.

*McMullen, Brooke, Knapp & Grenier* and *Robert E. Brooke*, for respondent Tholl.

*Kahin, Horswill, Keller, Rohrback, Waldo & Moren* and *J. Edmund Quigley*, for respondents Dorris and Haverfield.

DONWORTH, J.—This is an appeal by a plaintiff from the dismissal of his complaint at the end of the plaintiff's evidence. Wolf-Jurgen Hellriegel, plaintiff's teen-age son, was seriously injured when three of his friends tried to throw him into Lake Washington during an afternoon spent in

*[*]Reported in 417 P.2d 362.

water-skiing, sunbathing, and engaging in horseplay. The defendants in the suit are these three teen-age friends of plaintiff's son. Plaintiff sued in his own behalf for recovery of the cost of the medical care for his son, and sued in his son's behalf for the loss of income and for the temporary total disability and the alleged permanent partial disability, as well as for general damages for the alleged negligence and recklessness by which his son was harmed. Before trial, the complaint was amended by changing the grounds of the liability from negligence and recklessness to that of battery.

The only issue on this appeal is the issue decided by the trial court in the granting of the nonsuit—did the plaintiff present sufficient evidence to take the question of liability of any of the three defendants to the jury?

We need not review in detail all the evidence in the case. The rule which the trial court must apply in passing on a motion for a nonsuit is stated in *Parrish v. Ash*, 32 Wn.2d 637, 648, 203 P.2d 330 (1949). It reads:

> A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the opposing party's evidence and all inferences that reasonably can be drawn therefrom and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the party against whom the motion is made. *Billingsley v. Rovig-Temple Co.*, 16 Wn. (2d) 202, 133 P. (2d) 265; *White v. Fenner*, 16 Wn. (2d) 226, 133 P. (2d) 270.

There has been considerable reliance by respondents (both in the trial motion and on appeal) on the testimony of several witnesses other than appellant's son. We believe that, except to the extent that appellant's son admitted that such testimony was accurate, he is not bound by it for the purposes of the motion for nonsuit. Appellant's son testified extensively under direct and cross-examination concerning the circumstances leading up to and culminating in his injury. We need only consider his own testimony in order to determine the issue presented on this appeal, because he testified at length as quoted below. What the other witnesses

stated, in so far as their testimony was not corroborated by appellant's son, need not be considered in passing on the motion for nonsuit. *Parrish v. Ash, supra.*

Certain background against which to consider the sufficiency of appellant's evidence should be stated. On the afternoon of July 26, 1963, appellant's son, Wolf-Jurgen Hellriegel (called Dicka by his friends), a 15- or 16-year-old high school student, joined a group of friends and fellow students at the Mount Baker Beach, on Lake Washington, for an afternoon of water-skiing.

Although there may have been other teen-agers coming and going and for a time sunbathing and mingling with them, the group consisted primarily of the six witnesses whose testimony was presented to the trial court and is considered by this court on appeal. They were appellant's son, Miss Nina Trippy, Miss Darci Johnson, and the three minor respondents John Tholl, Gregory Haverfield, and Michael Dorris. Although these witnesses recall the general setting and the incident with varying details and with varying degrees of clarity about what happened, there appears to be no dispute that, in general, the circumstances leading up to the injury of minor appellant Hellriegel occurred approximately as young Hellriegel himself described it.

He stated:

Q. Now I call your attention to July 26, 1963. Starting the afternoon on that date, could you tell me what you were doing? A. I had just come home from the YMCA after two hours of the workout, and, well, I felt like water skiing; my brother did too. And we decided we would go. And my brother phoned Dick Bila and picked up Darci and Nina. He had a scooter at the time, so he made two trips. We brought them down to our house, which is on the lake, and we were laying on our beach waiting for Dick Bila to come by, when Mike Dorris came by. I may have phoned him earlier in the day and asked him to come down. But he came down, and about the same time Dick Bila arrived with his boat, and we rode in the boats over to the Mount Baker Beach and we started water skiing, taking turns, and taking turns driving the boat and skiing and watching the skier. Q. Did the girls ski?

A. No, they did not. Q. What were they doing while you were skiing? A. Mainly sun bathing. Q. Then what happened? A. After skiing it was, oh, I'd say, 3:00 o'clock, 3:30. We got tired of skiing and decided we should wait and rest up. We went up onto the beach, and, well, we sat around quite close. I had my back to Nina, we were talking, talking about next football year in school, and other things.

And somebody started throwing a pillow—I don't know who it was—it was Nina's pillow. And we threw it around, and after a while it got so far out of reach—we were kind of lazy at the time—and we just—I don't think we bothered about it and started throwing grass, and I guess after we tired of throwing grass we got around—talk got around to throwing people into the lake. And after a while of talking like this—I don't know—somebody must have said they could throw me in, or something to this effect, and I stated, "Oh, you couldn't throw me in even if you tried." And with that the three boys, Mike, Greg and John, jumped up and, well, tried to throw me into the water. I struggled for a while and I ended up in a sitting position parallel to the lake, facing, my head facing north, and Mike was behind me. Again, I was in a sitting position and John and Greg had my legs up in the air.

I was trying to get them off, and I had my hands reaching toward my legs when Mike, trying to reach my hands, must have slipped or lost his balance, and he fell on the back of my head and pushed it forward. I heard two cracks like somebody snapping his knuckles, and right after that I lost all control, I couldn't move my legs, and it was kind of a numb sensation all over.

I yelled out, I knew what had happened. I yelled out, "Please, let me down, I am paralyzed."

With that, John and Greg put down my legs and they must have—somehow they must have got them crossed, and Mike got off me as fast as possible. And then I just lay there looking up at the sun. There was a big tree above me. It was getting hot. I didn't notice it, but I figured somebody better put a towel over me. So they did this, and my brother arrived.

On cross-examination, he gave additional details as he recounted the occurrence as follows:

Q. Now you have played with these same boys since

the accident, haven't you? A. Well, not really played. I see them in the halls. Q. Don't you go around together? A. Mainly—Mike Dorris is my locker partner, and I see him. Q. And you used to play together before the accident, didn't you? A. Myself and Mike quite frequently were the same, more or less the same height and same strength, and we would compete at weight lifting and we'd wrestle quite a bit, yes. Q. And you had played down at this play area before you got hurt? A. Well, before we just skied off the dock, and that was that. Q. Well, that's playing, isn't it? A. Well, you could call it playing. Q. Recreation? A. Recreation. Q. But you had been down to this area on previous occasions with these same boys? A. Well, mainly with Mike and Dick Bila, and sometimes we would see Greg and John and a couple of the other kids next door, and Dietrichs. Q. As I recall your testimony when you took the stand, there were two motor boats involved, and there were approximately seven people that had been involved in the water skiing just before the accident? A. Yes. Q. As I understand your testimony, after the boats were beached and the people came up, the two girls that testified here were sunning on the beach? A. One boat was beached. Q. One was beached? A. I beached with Mike myself. Q. And then you went up on the grass, John Tholl and Greg Haverfield came down to meet you? A. Well, we were sitting there, the two girls, Michael Dorris and I. Q. The girls weren't in the boat, they had been up on the beach? A. Yes. They may have been riding in the boats at one time or another. Q. And you were approximately at that point twelve or fifteen or eighteen feet from the water's edge, is that true? A. Yes. Q. And you had your swim trunks on? A. Yes. Q. And some of them had trunks and some of them had what has been described as cutoffs? A. Yes. Q. And then you boys started throwing a pillow back and forth? A. Yes. Q. And you joined in with this? A. Yes. Q. Yesterday you said on the stand that someone had started throwing the pillow, but you participated in the pillow throwing yourself, didn't you? A. Yes, I threw the pillow, too. Q. Yes. And likewise you were throwing the grass with the other boys? A. Yes. After the pillow got out of our reach we started throwing grass. Q. About how long had you played back and forth that way until you got hurt? Two or three minutes, something like that? A. Well, you mean just throwing the pillow? Q. Yes. A. I'd say were were throwing it from

five to ten minutes. Q. About five to ten minutes? A. Yes. Q. And nobody was angry at anybody? A. No. Q. It was all in the spirit of fun, wasn't it? A. Right. Q. And then something was brought up about Greg, about maybe he'd go in the drink, is that right? A. I cannot remember that. Q. You don't recall that particular stage? A. No. Q. Do you know if it was made there? A. I couldn't know. Q. In any event, you said something to the effect the three of them couldn't throw you in, words to that effect? A. Somebody said that they could throw me in, and I said no they wouldn't be able to do it. And then they, well, more or less jumped me. Q. And then it was during the struggle, as I understand it, that Mike apparently lost his balance and slipped and fell against your head? A. Yes. Q. And did you hear this snap or crack that's been described? A. Yes, I did. Q. And felt it, of course? A. Yes. Q. And then did you ask John to . . . [cross] your legs or uncross your legs? A. Well, right after the snap I yelled out, "Let me down." So John and Greg had my feet up in the air, Mike—else I wouldn't have been able to get away from Mike. I was immobile.

In still further cross-examination, he stated these additional details concerning the precise moment when the injury occurred:

Q. (By Mr. Quigley) At this time Greg and John, as I understand, were down towards your feet, is that correct? A. Right. Q. But you were busy trying to keep your hands away from the boy that was at your head: Mike; is that true? A. I was trying to free the hands from my legs. Q. And where were you looking then? A. Down towards my legs. Q. And did you have your head ducked down? A. More or less, yes. Q. Well, of course you must have. A. I was in a sitting position. Q. And you were squirming around, weren't you? A. Yes, I was. Q. (By Mr. Waldo) The time this happened, you were strong and husky, weren't you? A. Yes, I was. Q. And as soon as you said you were hurt, these boys stopped at once, didn't they? A. Yes.

Appellant has assigned error solely to the trial court's determination that there was not sufficient evidence of a battery to establish a prima facie case of liability against respondents. Appellant acknowledges that the basis for the trial court's ruling is shown in the colloquy between counsel

and the court just prior to the granting of respondents' motion. The record shows that the trial court ruled that respondents were not liable because:

(1) The actions of respondents in trying to throw appellant's son into the lake were not such as to constitute an offensive touching of his person.

(2) The actions of respondents were consented to by appellant's son by his participation in the "horseplay" and his statement to the effect that all three of the boys could not throw him into the lake.

If the trial court is correct on either point, its judgment must be affirmed.

We shall first discuss the issue of consent before considering the issue of offensive touching.

It is agreed by all parties to the suit that consent is a defense to battery, except for some exceptions (not presently applicable) when consent cannot be given. The points on which the parties differ is whether the words and actions of Dicka amounted to consent to engage in the horseplay, and whether this consent was broad enough to encompass the events which caused his injury.

First, with regard to the significance of Dicka's words and actions, we agree with the trial court that his words were an invitation to respondents to try to throw him into the water if they thought they could. His statement to them (quoted above) constituted a consent that the boys could *try* to throw him into the lake (as distinguished from a consent to being thrown into the lake) and he thereby assumed the risk that he might be accidentally injured during the horseplay that necessarily would result from their attempt to throw him into the lake and his resistance to such attempt. Even if what he said was in response to someone's statement to the effect "Let's throw Dicka into the lake," his words were an invitation to try, as distinguished from a warning to the other boys *not* to try to throw him in because he did not want to be thrown in and would resist.

The setting in which these words were spoken is the key to their meaning. The boys had been throwing a pillow

around, apparently at each other, rather like a ball. They also threw grass when the pillow was thrown out of reach. They were all good friends. No one was angry, nor had anyone tried to withdraw from the horseplay. It was in good-natured fun.

If there had been the slightest indication that Dicka had not wanted to participate in this horseplay but had engaged in it only to the extent necessary to protect himself, then appellant's position might be plausible. However, we have Dicka's own statement that he had joined in the pillow throwing and the grass throwing. Dicka also stated that he and the boy who fell on him, Mike Dorris, were used to wrestling together prior to this accident. Dicka was very athletic and this activity was regarded by all of the boys as "fun." Under the circumstances shown by the evidence, it would be a strained and unreasonable interpretation of Dicka's statement to the boys to construe it as a warning not to try to throw him into the lake, because he did not want to be thrown in, even in fun, and that he would resist such an attempt.

Appellant's counsel argues in his brief that, even if Dicka gave any consent, it was consent to being thrown into the lake, and not a consent to have his neck broken, *i.e.,* that the scope of the consent did not include this battery. Of course, Dicka did not consent to having his neck broken. As we pointed out above, Dicka did not even consent to being thrown into the lake—he consented only to having his three friends *try* to throw him into the lake, while he resisted their attempt. In other words, *he consented to rough and tumble horseplay.*

Appellant's counsel argues in connection with this issue that Restatement, Torts § 53, and *Comment a* clearly show that the particular invasion was not consented to by Dicka. That section reads:

> To constitute a consent, the assent must be to the invasion itself and not merely to the act which causes it.

The two comments that follow this section state:

*Comment:*

> *a.* If the act to which assent is given is such that a

reasonable man would recognize that a particular invasion is substantially certain to result from it, an assent to the act is tantamount to an assent to the invasion, and, therefore, is as effective as a consent thereto.

. . . .

*b.* If two persons engage in a boxing match, neither of them assents to receiving any particular blow, since each hopes to avoid his adversary's blows by dodging, side-stepping or blocking. However, he does sufficiently express a willingness that the other shall try to hit him, and the expression of such willingness is a sufficient assent to those blows which he is unable to avoid, since while he may avoid some blows, he is substantially certain to receive others.

Appellant argues (1) that the invasion to which this section refers in the present case is the breaking of Dicka's neck, and (2) that the breaking of his neck was not substantially certain to result from being thrown into the lake, and that, therefore, he did not consent to this invasion. We do not agree with appellant's understanding of what the term "invasion" means as used in § 53 of the restatement. *Comment b* of that section shows that the "invasion" refers to the intentional acts, such as blows received in a boxing match, and not the injuries which may result from accidents such as accidental slipping, as in the case at bar.[1]

The invasion consented to in this instance, as we stated earlier, was rough and tumble horseplay. The question which § 53 of the restatement does not answer is, who takes the risk of injury which may accidentally result from such rough and tumble play? It seems to us that rough and tumble play is like an informal boxing match, which is described in *Comment b* above. The boxer accepts the risk of serious injuries from the blows received. See *McAdams v. Windham,* 208 Ala. 492, 94 So. 742, 30 A.L.R. 194 (1922). Persons who engage in roughhouse horseplay also accept the risk of accidental injuries which result from participa-

---

[1] Restatement (Second), Torts § 53 (1965), and citations in Appendix to Restatement (Second), Torts § 53 (1966), clearly show this to be correct, but since Restatement (Second), Torts § 892A has not yet been published in final form, we have not relied on the newer, incomplete reference work.

tion therein. See, also, *Gibeline v. Smith,* 106 Mo. App. 545, 80 S.W. 961 (1904).

It should be clear from the foregoing discussion that, when we apply the test (stated earlier in this opinion) of taking all of appellant's favorable evidence as true, and drawing all the favorable inferences therefrom, the only conclusion that can reasonably be drawn is that Dicka consented to the rough and tumble play. Therefore, there is no jury question on the issue of consent.

The second question is whether there was evidence of any intentional act which could be called "offensive contact" committed by respondents beyond the limits of that consent? The record is completely barren of any such evidence. The contact (when Mike Dorris slipped and fell onto Dicka) which actually broke Dicka's neck was accidental. All other contact was a part of the rough and tumble play.

Therefore, we must affirm the trial court.

Appellant has argued that the trial court erred in holding that there was no evidence of offensive contact in this case. We have read the colloquy between court and counsel on this issue. As we understand the record, the trial court was simply saying that, if the contact was within the consent, it could not be "offensive." Nothing would be gained by our discussing the separate legal analysis of the concept of "offensive contact" as that term is defined by Restatement, Torts § 19, and as that term is used in Restatement, Torts § 13. It is sufficient to say (so that our opinion will not be misunderstood) that, in the absence of consent, the other facts in this case might present a jury question on the issue of "offensive contact." Since consent was admitted in Dicka's testimony, we are not called upon to decide that question.

For the reasons given above, we agree with the trial court that appellant's evidence was not sufficient to require the case to be submitted to the jury. Therefore, we affirm the trial court's judgment of dismissal.

ROSELLINI, C. J., HUNTER and HALE, JJ., and BARNETT, J. Pro Tem., concur.