# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| KRYSTINA CARSON, a married individual, | No. 86049-6-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| MATTHEW ASHBACH, a married man; WESTERN WASHINGTON MEDICAL GROUP, INC., P.S., a Washington Corporation, | |
| Respondents. | |

BIRK, J. — Krystina Carson sued Dr. Matthew Ashbach and Western Washington Medical Group (WWMG), alleging claims for medical negligence, failure to obtain informed consent, and corporate negligence. The superior court granted summary judgment dismissing Carson's corporate negligence claim, and a jury returned a defense verdict on her remaining claims. Carson appeals, asserting that the trial court erred in (1) issuing a jury instruction based on RCW 7.70.060(5), (2) dismissing the corporate negligence claim against WWMG, and (3) empaneling a Kent jury for the Seattle designated case. We conclude that in the circumstances of Carson's claims, the superior court did not err, and we affirm.

I

Carson first procured the services of Dr. Ashbach, an otolaryngologist, in 2015 for a Botox injection. Carson had previously received cosmetic treatments, including Botox injections from 1997 to 2020, silicone injections in the 1990's, and injectable dermal fillers starting in 2014. In June 2016, Carson began seeing Dr. Ashbach for dermal filler injections. Dr. Ashbach was an employee of (WWMG). Starting in 2015, five to ten percent of his practice included administering Botox or fillers.

When asked about treating Carson in June 2016, Dr. Ashbach answered that he did not recall the discussion that they had, but he described the conversation he said he usually had with first-time dermal filler patients. This conversation would include severe risks of the procedure, such as blood vessel blockage. Carson signed a consent form. She selected Radiesse, a calcium hydroxyapatite-based filler, because "it lasts longer." Between June 2016 and December 2019, Dr. Ashbach provided Carson with five Radiesse injections.

In early 2020, Dr. Ashbach testified he became aware that there were reports of increasing numbers of complications with Radiesse, including some with "people sloughing off skin of their face [and] going blind." Radiesse cannot be reversed when there is a less than optimal outcome. In contrast, hyaluronic acid-based fillers can be dissolved. After seeing increasing reports of complications with Radiesse, Dr. Ashbach administered significantly less Radiesse in 2020 than prior years. In March 2020 he recommended to Carson that she switch to Refyne. Carson agreed. She did not sign a new informed consent form.

In October 2020, Carson returned to Dr. Ashbach, she wanted to switch back to Radiesse because Refyne "was dissipating too quickly." Carson and Dr. Ashbach had a conversation about returning to Radiesse. Carson did not receive a new or updated informed consent form. Dr. Ashbach administered the Radiesse injection.

When she got home, Carson felt a "numb tingling sensation" and after trying to identify possible causes on the internet, she decided that she would "sleep on it" and "call first thing in the morning." By 8 p.m. her face had swelled up and turned "grayish-green." Carson decided not to go to the emergency room, reasoning that an emergency room wasn't "equipped to deal with a cosmetic thing," and "[i]t was a horrible time to be at the emergency room" because of the COVID-19 pandemic. In the morning, she called Dr. Ashbach's office and was told to "[c]ome in right away."

Dr. Ashbach assumed that the injection had hit a blood vessel. That complication interrupts blood flow to the affected area, reducing oxygen, and potentially leading to necrosis, tissue loss, blindness, and stroke symptoms. Dr. Ashbach treated Carson throughout October and November. Carson continued to see Dr. Ashbach until March 2021. As a result of the October Radiesse injection, Carson suffered permanent damage to her face, including "loss of her left nasal ala with soft tissue loss and extensive scarring of the left medial cheek and upper and lower lip."

In January 2022, Carson filed this lawsuit against Dr. Ashbach and WWMG, alleging claims for medical negligence, failure to obtain informed consent, and corporate negligence. The superior court granted partial summary judgment dismissing the corporate negligence claim. The Seattle designated case was assigned to a judge at the Maleng Regional Justice Center in Kent and the court empaneled with a jury drawn from the Kent jury assignment area. After ten days of trial, the jury returned a verdict finding that Carson had not met her burden of proof on her informed consent or negligence claims. Carson appeals.

II

Carson argues that jury instruction 12 was erroneous, prejudicial, and an improper comment on the evidence. Jury instruction 12 stated, "Failure to use a form on a given occasion is not, standing alone, evidence of a failure to obtain informed consent." Carson argues that the instruction was error because it instructed the "jury to not consider the custom and practice of the very physicians who testified at trial," "was not supported by any law," and "prejudicially emphasized [Dr. Ashbach's] case theory." (Emphasis omitted.) The instruction was based on RCW 7.70.060(5), which states in relevant part, "Failure to use a form . . . shall not be admissible as evidence of failure to obtain informed consent." Carson is correct that RCW 7.70.060(5) is concerned with the admissibility of evidence. But based on the evidence presented at trial, the trial court was justifiably concerned that "in light of the total case," there was a "danger" that jurors would think that Dr. Ashbach "not using the form in 2020 settles the case." Given that concern, the trial court acted within its discretion in issuing jury instruction 12,

4

which did not prejudice Carson, improperly comment on the evidence, or prevent either party from arguing their theories of the case.

A

Appellate courts review a trial court's decision to give a jury instruction de novo if based on a matter of law, and for abuse of discretion if based on a matter of fact. Lake Hills Invs., LLC v. Rushforth Constr. Co., Inc., 198 Wn.2d 209, 215-16, 494 P.3d 410 (2021). Prejudice is presumed if the instruction contains a clear misstatement of law. Id. at 216. The party challenging the instruction bears the burden of showing prejudice. Fergen v. Sestero, 182 Wn.2d 794, 803, 346 P.3d 708 (2015). Whether to give a specific instruction is reviewed for abuse of discretion. Id. at 802-03. The propriety of an instruction is dictated by the facts of the case. Id. at 803. Instructions are sufficient when they are supported by the evidence, allow each side to argue their theories of the case, and properly inform the trier of fact of the law. Id. Instructions need not "present elements verbatim from a statute." State v. Bergstrom, 199 Wn.2d 23, 38, 502 P.3d 837 (2022).

The meaning of a statute is a question of law reviewed de novo. Wolf v. State, 2 Wn.3d 93, 102, 534 P.3d 822 (2023). The fundamental objective when interpreting a statute is to ascertain and give effect to the legislature's intent, if the meaning of the statute is plain on its face, then the court must give effect to that meaning as an expression of legislative intent. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

B

RCW 7.70.060(5) regulates the admissibility of evidence, calling upon the court to exclude evidence of failure to use a form if offered for the purpose of proving failure to obtain informed consent. RCW 7.70.060(5). The statute does not bar evidence of failure to use a form not offered for the prohibited purpose. In this respect, the statute resembles other evidence rules, such as ER 404(b), which prohibits evidence of other crimes, wrongs, or acts for the purpose of showing action in conformity therewith, but does not prohibit such evidence for an undefined number of other, proper purposes. State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012). The language of RCW 7.70.060(5) does not define the substantive law of a claim for lack of informed consent, whose elements instead derive from RCW 7.70.050, as the court instructed here. See 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 105.04 (7th Ed. 2022).

The import of RCW 7.70.060(5) and the use of informed consent forms were heavily contested by the parties. Dr. Ashbach's moved in limine that, "the plaintiff should not be allowed to ask misleading questions of Dr. Ashbach about written informed consent." In response, the trial court ruled, "To the degree that those questions *overemphasize this notion of written consent*, that motion, I think from defense is proper." (Emphasis added.) In further argument, Carson offered an example question: "Was there anything preventing you from advising your patients *in writing* in early 2020 of the journal findings that you discovered on Radiesse?" (Emphasis added.) The trial court told Carson's counsel, "by way of example, and by talking about material risks in writing, and yes, I think you are there emphasizing

in a very subtle way to the jury, you know, you didn't do this. I'm not going to tell you it needs to be in writing, but I'm going to ask this question and then you draw your own conclusion."

The court also granted Dr. Ashbach's motion in limine that "[t]he Court should exclude evidence or argument that Dr. Ashbach was required to obtain informed consent at every visit." Carson's attorney sought clarification on the scope of the motion: "But how he obtained it and also whether or not he could have or perhaps should have obtained the writing is not excluded. It's just solely exclusion that there's any argument or testimony about there being a requirement." The court replied, adding, "[o]r inference that there's a requirement." Finally, the court denied Carson's motion to admit consent forms by physicians who had not treated her under ER 403.

After evidence concluded, Dr. Ashbach proposed a jury instruction based on the language of RCW 7.70.060(5). The court asked the parties to work on an instruction together because the court thought that "in light of the total case" there was a "danger" that jurors would think that failure to use a form in 2020 "settles the case." Instruction 12 was the resulting jury instruction, proposed by Carson under objection.

The testimony supported the trial court's concern that there was danger of jurors believing Dr. Ashbach's failure to use a form in October 2020 was evidence of failure to obtain informed consent. Carson had examined her expert witness Dr. Daniel Levy, about informed consent, emphasizing written consent:

Q.    Have you heard the term "informed consent" before?

7

A: Yes.

Q. What does that mean to you?

A. That means that a patient has had the time to become fully informed about the procedure that they're about to have, and *that means reading through a consent form* that discusses all the risks and benefits and alternatives. And then also having a conversation about that—their review of that form. And then, you know, once they're fully informed, you know, them providing, you know verbal *and written consent to proceed with that treatment.*

Q. And you touched on it a little bit, but can you walk us through the process of how you make sure the patient is fully informed?

A. Yeah. In my practice it's—you know, *there's a written consent form of several pages* and each section has a little spot where they initial that they've read through, and then *an area at the end where they sign that they've read through*.

(Emphasis added.) Carson asked Dr. Levy about the importance of written informed consent:

Q. Why do you feel it's important—why not just have a conversation with the patient and tell them those risks verbally? Why also include those risks in your form that you provide them?

A. It's just a method of communication of that risk. Some people seem to scan and read and gather information from reading a document more thoroughly than they do from a direct conversation, and vice versa, some people don't capture as much from the written document and capture more from the verbal discussion. And so we just have it available in both forms.

Carson asked Dr. Levy about his process for documenting informed consent:

Q. In your opinion, can a patient be fully informed about the risks of an injectable filler if they're unaware of either a vessel occlusion or necrosis or blindness?

A. No.

Q. And how do you *document* the fact that a patient is fully informed before you agree to give them an injectable dermal filler?

8

> A. *It's documented by them signing the consent form*, which is part of their chart note.
>
> Q. And let's say you don't have a chart—or excuse me, a consent form signed by the client, do you still document whether or not the patient consented elsewhere in the chart?
>
> A. I don't—I do not have a written consent form?
>
> Q. Right. Are you—
>
> A. *So I've never worked without having a written consent form.*

(Emphasis added.)

Carson cross-examined defense expert witness Dr. Amit Bhrany, in similar fashion:

> Q. . . . And you give the patient—the title of the form is called "Informed Consent to Perform a Dermal Filler," *every time you use an injectable filler, right?*
>
> A. I give the form, yes. We do give the form mainly just as a record, again, that they're providing us consent to inject.
>
> Q. *And, in fact, if someone comes in, signs a form, if they come back six months later, eight months later, you have them sign the form again, right?*
>
> A. I do have them sign the form, but we typically don't have the extent of the conversation. It's mainly, just again, it's just a record of the discussion they've consented to be injected.
>
> Q. *And so for every subsequent visit after the first one, you still have them review and sign the form, true?*
>
> A. *I have them review the form, yep, and sign them.*
>
> Q. *And you won't—or don't give patients dermal fillers unless they've signed the form, correct?*
>
> A. If—there are times where we forget to give them the form. So in that instance I would—you know, given someone checked in. But if someone actively looks at the form and says, you know, I don't want to—I'm not going to sign this, then we absolutely, yes, we don't—
>
> Q. Your Spidey-senses would be up at that point, right?
>
> A Yes. Exactly.

(Emphasis added.)

Carson called expert witness Dr. Samson Lee, who also testified about the importance of forms in the informed consent process:

> Q. Have you heard the term "informed consent?"

A. Yes.

Q. What does that mean to you?

A. It means that the patient understands the potential risks, benefits, outcomes of the procedure that you're asking their permission to perform.

Q. And *how do you make sure the patient is fully informed* before, for example, you give them an injectable dermal filler?

A. *We have them read through the consent form* and we have a verbal conversation. At the end of the conversation, I always ask them: do you have any additional questions? Do you understand?
    And then give them the opportunity to ask a question if they don't understand.

Q. *Why don't you just have the conversation with them? Why do you also give them a form?*

A. Well, *because I believe you need to have documentation, whether it's a consent form or documentation in the medical record of your conversation* outlining potential complications and risks.

(Emphasis added.) Later, Carson's counsel questioned Dr. Lee about the American Medical Association's code of ethics in regard to informed consent and documentation:

Q. [Code of medical ethics 2.1.1] indicates that informed consent to medical treatment is fundamental in both ethics and law. You agree with that?

A. Yes.

Q. And then it identifies the process of informed consent and states that if the patient—in seeking a patient's informed consent physicians should; right? These are the recommendations under the code of medical ethics. You see that?

A. Yes.

Q. And then number 3 indicates: Document the informed consent conversation and the patient or surrogate's decision in the medical record in some manner. Do you agree with that?

A. I do.

Q. And then: *When the patient/surrogate has provided specific written consent, the consent form should be included in the record. Do you agree with that?*

A. *I do.*

(Emphasis added.) Carson's trial evidence suggested the inference that the failure to use a form meant that Dr. Ashbach failed to obtain informed consent from Carson in October 2020, even though RCW 7.70.060(5) made the failure to use a form inadmissible to prove that conclusion.

Carson argues she was entitled to show "the customary practice of *how* physicians obtain informed consent from their patients." Carson implies this includes customary practices about written versus oral disclosures, but her cases do not support her conclusion. In Smith v. Shannon, 100 Wn.2d 26, 28, 35, 666 P.2d 351 (1983), where a patient asserted a physician had not disclosed certain risks, the court said the trier of fact could consider customary practice about what is disclosed as some evidence bearing on materiality. In Brown v. Dahl, 41 Wn. App. 565, 572, 574, 705 P.2d 781 (1985), there was testimony that a signed consent form inadequately informed the patient of risks and alternatives, but in a context where the patient testified the physician had disclosed no risks and his expert witnesses testified the form was inadequate to provide the missing information. And in Miller v. Kennedy, 11 Wn. App. 272, 286-88, 522 P.2d 852 (1974), aff'd, 85 Wn.2d 151, 530 P.2d 334 (1975), after holding that the materiality of the risk rather than physician custom governs the duty to inform, the court added that in some cases a physician may present evidence of a standard of nondisclosure for medical reasons. These cases concerned customary practice about whether a risk needed to be disclosed or not based on its materiality, not about disclosure through oral or written means.

RCW 7.70.060(5) does not support instructing the jury as a matter of course about the use of informed consent forms. The statute is a rule of admissibility guiding the court in the evidence the jury should have. Here, however, the trial court determined that Carson had fostered the prohibited inference that failure to use a form showed a failure to obtain informed consent. We hold that when a trial court reasonably concludes a plaintiff claiming lack of informed consent has fostered such an inference, then it may respond with an instruction cabining the evidence to purposes not foreclosed by RCW 7.70.060(5). The record as a whole led the trial court to conclude that a jury instruction was necessary to bar the jury's potential use of failure to use a form for the purpose prohibited by RCW 7.70.060(5). The trial court did not abuse its discretion in making this determination and issuing instruction 12.

If a plaintiff never suggests reliance on failure to use a form for an evidentiary purpose barred by RCW 7.70.060(5), then there would be no need to instruct the jury against such a conclusion, and the instruction given here would be misleading and inappropriate. Additionally, even in a case such as this one, the instruction was discretionary, not mandatory. See Fergen, 182 Wn.2d at 802-803 (discretion in instructing the jury). As the defense argued in closing, the pattern instructions on lack of informed consent based on RCW 7.70.050 never indicate that a written form is required. Here, Dr. Ashbach was able to and did argue that the law had no such requirement with reference solely to the pattern instructions, without reference to instruction 12. He would have been able to argue its theory of the case even without instruction 12.

12

We reject Carson's argument that the instruction was an improper comment on the evidence. Article 4, section 16 of the Washington Constitution prohibits judges from charging juries with respect to matters of fact, or commenting thereon, and mandates that they declare the law. Hizey v. Carpenter, 119 Wn.2d 251, 271, 830 P.2d 64 (1992). This prohibition prevents the jury from being influenced by knowledge conveyed to it by the court of what the court's opinion is on the testimony submitted. Id. A constitutionally prohibited comment on the evidence allows the jury to infer from what the judge said or did not say that the judge personally believed or disbelieved the testimony in question. Id. Here, instruction 12 did not either suggest the judge's personal view or belief or disbelief of any evidence. Both sides argued their theories consistent with the instruction: Carson that Dr. Ashbach had never informed her of the risks of Radiesse, and Dr. Ashbach that he had discussed the risks with Carson and that she would have elected to use Radiesse even if she had known the risks. See Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) (" 'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.' ") (quoting Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)). And the instruction did not result in multiple, overlapping, consecutive instructions that have been held unfair overemphasis in extreme cases. See Samuelson v. Freeman, 75 Wn.2d 894, 897, 454 P.2d 406 (1969).

13

III

Carson asserts that the trial court erred in dismissing her corporate negligence claim against WWMG at summary judgment. We conclude any error in the dismissal of Carson's corporate negligence claim has been made moot by the verdict.

This court reviews summary judgment orders de novo. Hisle v. Todd Pac. Shipyards Corp., 151 Wn.2d 853, 860, 93 P.3d 108 (2004). In Pedroza v. Bryant, the Washington Supreme Court held that the corporate negligence doctrine imposed "a nondelegable duty" on hospitals to their patients. 101 Wn.2d 226, 229, 233, 677 P.2d 166 (1984). These nondelegable duties of hospitals include (1) exercising reasonable care in the maintenance of buildings and grounds, (2) furnishing patients with supplies and equipment free of defects, (3) selecting employees with reasonable care, and (4) supervising practitioners of medicine "within its walls." Douglas v. Freeman, 117 Wn.2d 242, 248, 814 P.2d 1160 (1991).

In Carson's original complaint, she alleged a claim against WWMG for corporate negligence. As a basis for this claim, Carson asserted that WWMG had failed to properly train and supervise Dr. Ashbach, and that it was liable for failure to obtain informed consent and the treatment of Carson. At summary judgment, Carson's expert testimony addressed WWMG's training and supervision of Dr. Ashbach's informed consent process. She relied on an expert concluding that WWMG failed "to implement Washington State required minimum informed consent processes." The jury found that Carson did not meet her burden of proof that Dr. Ashbach had failed to obtain informed consent. Because Dr. Ashbach did

not fail to obtain informed consent, any negligence by WWMG in training or supervising Dr. Ashbach's informed consent practices could not have proximately caused injury to Carson. See Bundrick v. Stewart, 128 Wn. App. 11, 20, 114 P.3d 1204 (2005) (The "jury's finding on the informed consent issue decided the fact question dispositive of the common law claim."). As a result, Carson's corporate negligence claim has been made moot by the verdict.

IV

Carson asserts that the trial court erred when it used the Kent jury pool for the Seattle designated case.

King County Superior Court has two courthouses, in Seattle and Kent. State v. Rivers, 1 Wn.3d 834, 842, 533 P.3d 410 (2023). The legislature amended the jury summons statute to permit counties with multiple courthouses "to create multiple jury districts within the county." Id. This was done to alleviate the burdens on jurors by narrowing the geographic area in which jurors would have to travel to perform their civic duties. Id. Under King County Superior Court local rules, civil cases are designated by the filing party as either being in the Seattle case assignment area or the Kent case assignment area. King County Local Civil Rule (KCLCR) 82(e)(1). Proceedings before a judge "shall be conducted at any of the court facilities based on the location of the judge." KCLCR 82(e)(2)(B). The court may, on its own motion, assign or transfer cases to another case assignment area in the county "whenever required for the just and efficient administration of justice." KCLR 82(e)(4)(C).

Pursuant to this authority, the case was assigned to a judge based in Kent for trial. The court ruled that it would be "an undue hardship for jurors" to draw from the Seattle jury pool. The court did not err in this decision. It was both proper under the rules, and correctly reflected the considerations that went into establishing the case assignment areas.

Affirmed.

_____
Birk, J.

WE CONCUR:

_____   _____
Coburn, J.                   Dwyer, J.